135 N.J. 155 (1994)
638 A.2d 1274
IN THE MATTER OF M.R., AN ALLEGED INCOMPETENT OR MENTALLY RETARDED ADULT.
The Supreme Court of New Jersey.
Argued October 26, 1993.
Decided April 7, 1994.
*158 Linda J. Robinson argued the cause for appellant, M.R. (Herbert D. Hinkle, attorney).
Janice Dailey Pasculli argued the cause for respondent R.T.
James P. Fox argued the casue for respondent M.R. (Morris, Downing & Sherred, attorneys; Paul G. Hunczak, on the brief).
Joseph B. Young, Deputy Public Advocate, argued the cause for amicus curiae Public Advocate (Zulima V. Farber, Public Advocate, attorney; Sarah Wiggins Mitchell, Director, Division of Advocacy for the Developmentally Disabled, of counsel).
*159 Stuart H. Weiner argued the cause for amicus curiae New Jersey United Self Advocates.
The opinion of the Court was delivered by POLLOCK, J.
At issue is whether a developmentally-disabled woman who is generally incompetent bears the burden of proof that she has the specific capacity to choose with which of her divorced parents she will live. After adjudicating M.R. incompetent, the Chancery Division ruled that M.R.'s father, as the party seeking to prove M.R.'s specific capacity, bore this burden. Finding that he had failed to meet his burden, the court decided that M.R. should live with her mother. With one judge dissenting, the Appellate Division affirmed in an unreported decision. M.R.'s father appealed as of right from the issue that divided the Appellate Division, the allocation of the burden of proof on M.R.'s specific capacity. We then granted the father's petition for certification, 133 N.J. 444, 627 A.2d 1148 (1993), which questioned both the standard for determining the specific capacity of an otherwise-incompetent person to decide where to live and the role of appointed counsel in guardianship proceedings.

-I-
M.R. is a mildly- to moderately-retarded twenty-one-year-old woman with Down's Syndrome. All parties agree with the provision in the judgment of guardianship that "she is incapable of governing herself and managing her affairs." M.R.'s father, however, challenges the appointment of her mother as her general guardian. He also questions whether M.R. should continue to live with her mother, as she has since her parents were divorced in 1979, or with him.
As M.R. approached her eighteenth birthday, she expressed a desire to move from her mother's to her father's home. Because M.R.'s mother wanted M.R. to continue to live with her, she instituted this action seeking guardianship of M.R. Pursuant to *160 Rule 4:86-4(b), the trial court appointed Paul G. Hunczak, Esq. to act as M.R.'s attorney.
At trial, the critical issue was whether M.R. had the specific capacity to express a preference to reside with her father. The testimony was in substantial accord about the objective facts pertaining to M.R.'s mental capacity. The court appointed Dr. Deborah Dawson, who has a doctorate in psychology and who has served as the director of the Guardianship Evaluation Project of the Center for Applied Psychology at Rutgers University, to examine M.R. Dr. Dawson found that M.R. was mildly retarded. She based that finding on M.R.'s I.Q. score of sixty-six on the revised Wechsler Adult Intelligence Scale test. Dr. Dawson testified that M.R.'s score on the Vineland Behavioral Scales placed her between a six- and eight-year-old level of social behavior. Additionally, M.R.'s adaptive behavior skills placed her around the eight-year-old level. Dr. Dawson concluded that M.R. was capable of expressing a preference, testifying that "[t]he choice of where to live is [a] very specific [one] ... that [M.R.] is able to understand."
M.R.'s mother presented two expert witnesses in support of her contention that M.R. did not have the specific capacity to choose where to live. The first witness was David Hegner, who holds a master's degree in special education, is the chairman of the Special Education Department at M.R.'s school, and had been M.R.'s special-education teacher for the two years preceding the trial. Mr. Hegner testified that, although M.R. was "inconsistent," she generally functioned at a second- or third-grade level. Her social functioning likewise was on an eight- or nine-year-old level. Although he acknowledged that she might make certain decisions at a "more advanced level" than an eight- or nine-year old, he remained skeptical of her ability to make "logical adult choices." Mr. Hegner characterized M.R.'s reasons for preferring to live with her father as "fun things," and concluded that M.R. could not make an "adult decision" concerning residence.
*161 The second witness was Ira Yorn, a certified school psychologist with a master's degree in psychology. At the time of trial, he had been M.R.'s school psychologist and case manager for two years. He testified that M.R.'s I.Q. ranged from forty-five to fifty-four, scores that placed her in the educable level of the mentally-deficient range. Her verbal skills were equivalent to those of a seven- to ten-year old, and her non-verbal skills ranged from the ability of a six-and-one-half-year old to that of an eight-year old. Significantly, her practical and social judgment was that of a six-year old. Based on a history provided by M.R.'s mother, Mr. Yorn estimated that M.R. ranged from eight years, five months in community-living skills to twelve years, two months in personal-living skills on the Woodcock Johnson scale. Mr. Yorn evaluated M.R.'s overall functioning as that of an eight- or nine-year old.
Manifest from the record are the continuing disputes between M.R.'s parents over the custody of M.R. Notwithstanding the acrimony between them, the trial court found that either parent's home would provide a "loving environment." The court recognized, however, that the mother and father presented "contrasting parenting styles."
Both parents recognize the need for M.R. to become independent. They differ, however, on the method of achieving that goal, her mother perceiving the need for structure and her father emphasizing the need for freedom.
When visiting her father, M.R. answers the phone, participates in 4-H dances on Friday nights, attends catechism on Saturday mornings, and goes bowling. If she were to live with her father, she could attend the Elk's dance on Monday nights, and engage in swimming, aerobics, and basketball. According to her father,
[a]t our house [M.R.] has choices. She can pick out what she likes to wear. She can pick out what she likes to do on the weekends. When she's there in summertime, she can pick out what she likes to do. We go to the store. She can scan groceries. She can  she has activities that she can go to. She has a good comfortable atmosphere at our house.
*162 M.R.'s mother, on the other hand, focused more on the importance of balancing M.R.'s freedom of choice with structure in her home life. She testified:
[M.R.] needs to know that there are some rules that she has to follow. And she has to follow them. She has those chances to do things that she wants. She gets her choices. But in some instances I don't think it's good to just be that free, and give her that many, many choices.... I think it's important, very important, for her to have [a] structured life, at home, as well as in school.
Mr. Hegner confirmed that developmentally-disabled students need structure. One reason is "because the types of jobs that most of my students are going to get are going to be repetitive in nature when they leave high school." Nonetheless, M.R. leads an active life while with her mother.
During the summer of 1990, M.R. had a summer job and participated in the Special Olympics. With her mother, M.R. was responsible for household chores, helped with food shopping, and went shopping alone. As of the time of the hearing, M.R. attended dance classes on Wednesday nights, participated in track and field, went to the movies with friends, and camped with her mother and stepfather. She has attended Confraternity of Christian Doctrine classes and been confirmed in the Catholic Church. Sometimes M.R. joins her stepfather, a district sales manager for a baking company, on a cake truck. According to her mother, she is allowed to answer the family phone, but not her stepfather's business phone.
M.R.'s father thought that M.R. was "being held back" in her mother's home. Her I.Q. scores, however, had increased from fifty-four in 1986 to sixty-six in 1991. Dr. Dawson attributed the increase in part to M.R.'s enrollment in a more challenging Educable Mentally Retarded class over the last two years, a class that M.R. has attended while living with her mother.
M.R. believed that her father was more likely than her mother to heed her wishes, a belief shared by Dr. Dawson. Similarly, Dr. Dawson thought that M.R. would experience more growth in "community skills in [her father's household] simply because she's given more exposure and more experience." Finally, she testified *163 that since 1987 M.R. had expressed a preference to live with her father. To deny M.R. her choice, Dr. Dawson stated, would be a "significant blow" to M.R.'s self-esteem.
In an in-chambers interview, the trial court sought to ascertain M.R.'s preference. M.R. spoke enthusiastically about her summer job at her school, a job that would entail living with her mother. When, however, the court asked M.R. whom it should appoint to help her "make tough decisions," she chose her father.
The trial court concluded that M.R. associates her home in Sparta with school and rules and associates her father's home, which she visits on weekends and during summer vacation, with happier times. It also noted M.R.'s belief that if she were allowed to live with her father, she could be like her older sister, who had moved to her father's home. M.R. believed that, like her sister, she could obtain a driver's license, leave her father's home, marry, and have a baby. The court summarized M.R.'s reasons for wanting to live with her father as "boys, babies, and boyfriends."
The court recognized that M.R. "had expressed a preference" to live with her father. Whether M.R. was capable of expressing a reliable preference, however, was another matter. It held that M.R.'s father bore the burden to show that M.R. had the specific capacity to express that preference:
The question, of course, is whether or not [M.R.] has the mental capacity to decide [where to live].
It is the defendant [M.R.'s father], who argues that there should be a finding by the court of specific competency and, therefore, the burden is upon the defendant to convince the court by [a] preponderance of the evidence that it's more likely than not [M.R.] has the capacity in this limited area to decide for herself.
Continuing, the court found that M.R.'s father had not met this burden. It found an inconsistency between Dr. Dawson's written report and her testimony. In her report, Dr. Dawson had concluded that M.R. was incapable of choosing which parent should serve as her guardian. In her testimony, however, she stated that M.R. was capable of choosing with which parent she should live. While recognizing "some distinction between selecting a guardian and selecting where you reside," the court found an inherent *164 inconsistency "in saying that [M.R.] doesn't know who should be looking out for her interest and serving as guardian and helping her with a decision," but also saying that "[M.R.] knows who she wants to live with." Instead, the court relied on Mr. Hegner's testimony that "it is hard to say" whether M.R. would understand the significance of where she wants to live. Additionally, the court relied on its interview with M.R., which led it to conclude that M.R.'s reasons for wanting to live with her father were neither logical nor rational. It found M.R. to be "difficult to understand. She jumped about." Further, her reasons for choosing to live with her father "were not clear. They weren't logical. They weren't rational." Significantly, the court held that M.R. did not understand the nature of the proceeding and that "[s]he is unable to realistically consider the consequences of either parent's appointment and the concurrent results for herself." Accordingly, the court held that M.R. lacked the specific capacity to decide where to live.
Given that holding, the court proceeded to the question of which party bore the burden of proving M.R.'s best interests concerning her place of residence. It placed this burden on M.R.'s father as the party seeking to change the status quo, and found that he had not met the burden. In reaching that result, the court explained that M.R. was doing well in her mother's home and that she enjoyed the companionship of both her mother and her maternal grandmother, with whom M.R. has a close relationship. The court also noted that M.R. continues to work with Mr. Hegner in the public school system.
Viewing the case as one of "contrasting parenting styles," the court was troubled that M.R.'s father "may overestimate his daughter's abilities." That overestimation, according to the court, "could result in [a] situation where she could conceivably be at risk." Noting that M.R.'s need for a guardian was undisputed, the court concluded: "I mean it's not enough to be a guardian and to defer to the wishes of your ward. If this girl is not competent, and she needs help in making major decisions, that certainly runs *165 contrary to the notion that it's her life and she should decide for herself." The trial court accordingly awarded guardianship to M.R.'s mother.
The Appellate Division affirmed, holding that the trial court properly had placed the burden of proof to show specific capacity on M.R.'s father. The dissenting judge contended that the burden should have been placed on M.R.'s mother as the party contending that M.R. lacked specific capacity to choose her residence.

-II-
This case raises the challenging question of the extent to which a generally-incompetent developmentally-disabled person may determine where she is to live. Our concern is with balancing the right of self-determination of developmentally-disabled people with traditional judicial concerns for their best interests. Although our decision nominally considers only the allocation of the burden of proof, beneath that allocation lie significant policy choices about the rights of developmentally-disabled people to make decisions for themselves and the role of courts in the decisionmaking process.
The term "developmental disability" includes many conditions unrelated to intellectual capacity. M.R.'s disability, the result of a genetic defect, has left her mildly to moderately retarded. M.R. is not alone. Recent estimates suggest that over 80,000 New Jersey residents meet the State's functional definition of developmentally disabled. Bureau of Economic Research, Rutgers, The State University, The New Jersey Demographics of Disability Survey: Executive Summary 11 (1992). These disabilities include mental retardation, cerebral palsy, autism, epilepsy, spina bifida, severe learning disabilities, and some severe sensory impairments. Supreme Court Judiciary Surrogates Liaison Committee, Guidelines for Attorneys Appointed to Represent Individuals with Developmental Disabilities (Tentative Draft) at 3 (Fall 1993) (Guidelines for Attorneys). Our Judiciary Surrogates Liaison Committee recognized that the nature and degree of disability varies from *166 person to person, stating that "[n]ot all developmental disabilities have consequences that would affect a person's ability to make decisions." Ibid. Our decision, therefore, affects not only M.R. but also other developmentally-disabled people. Specifically, the decision will affect the extent to which developmentally-disabled people are free to make decisions about their lives.
For guidance, we turn to traditional sources of law: the State Constitution, legislative acts, administrative regulations, and judicial decisions. The clear public policy of this State, as reflected in those sources, is to respect the right of self-determination of all people, including the developmentally disabled. Respect for that right is implicit in the State Constitution, which recognizes that "[a]ll persons are by nature free and independent, and have certain natural and inalienable rights, among which are those of enjoying and defending life and liberty ... and of pursuing and obtaining safety and happiness." N.J. Const. art. I, ¶ 1. The Legislature, when addressing the rights of developmentally-disabled citizens in State institutions, declared
that the developmentally disabled are entitled to certain fundamental rights as citizens and that these rights shall not be abrogated solely by reason of admission to any facility or receipt of any service for developmentally disabled persons; [and] that services which are offered to the developmentally disabled shall be provided in a manner which respects the dignity, individuality and constitutional, civil and legal rights of each developmentally disabled person.... [N.J.S.A. 30:6D-2.]
Similarly, the Department of Human Services, in its regulations pertaining to the appointment of guardians, has recognized that "[n]ot every individual with developmental disabilities needs a guardian." N.J.A.C. 10:43-2.1(a).
As guardians of personal rights, courts have a special responsibility to protect the right of self-determination. In re Conroy, 98 N.J. 321, 345, 486 A.2d 1209 (1985). Concerning developmentally-disabled citizens, we have declared that the public policy of this State is "to maximize the developmental potential of [developmentally-disabled persons] while affording them the maximum feasible personal liberty." New Jersey Ass'n for Retarded Citizens v. Human Servs., 89 N.J. 234, 252, 445 A.2d 704 (1982). In construing *167 the Developmentally Disabled Rights Act, N.J.S.A. 30:6D-1 to -22, we have noted that the Act required the State to provide services to mentally-retarded persons "in `a setting and manner which is least restrictive of each person's personal liberty.'" Id. at 250, 445 A.2d 704 (quoting N.J.S.A. 30:6D-9). Supporting that "requirement is the assumption that handicapped people are autonomous individuals entitled to the same rights and liberties as all other citizens." Ibid.

-III-
Unless they endanger themselves or others, competent people ordinarily can choose what they want, even if their choices are irrational or dangerous. Traditionally, however, courts have tempered the right of self-determination of incompetent people with concerns for their best interests. The paradox with incompetent people is to preserve as much as possible their right of self-determination while discharging the judicial responsibility to protect their best interests.
We have sought to balance the competing interests in a series of analogous cases involving the termination of medical treatment. Competent patients enjoy the right to determine treatment alternatives, including the termination of medical treatment. In re Farrell, 108 N.J. 335, 358, 529 A.2d 404 (1987); Conroy, supra, 98 N.J. at 353, 486 A.2d 1209. By recourse to a "substituted judgment" test, once-competent patients who have become incompetent also can express their right of self-determination. In re Jobes, 108 N.J. 394, 414, 529 A.2d 434 (1987). With such patients, the question is not what a reasonable person would choose, but what choice the patient would have made if able to choose. Conroy, supra, 98 N.J. at 360-61, 486 A.2d 1209. Patients who provide no evidence of their preference are remitted to a best-interest test. Id. at 366, 486 A.2d 1209. The substituted-judgment and best-interest tests are not dichotomous, but represent points on a continuum of subjective and objective information leading to a reliable decision that gives as much weight as possible *168 to the right of self-determination. See Symposium, Guardianship: An Agenda for Reform: Recommendations of the National Guardianship Symposium and Policy of the American Bar Association, 13 Mental & Physical Disability L. Rep. 274, 290-91 (1989) (Agenda for Reform) (noting that best-interest analysis considers "`moral, medical, psychological, and financial concerns expressed as much as possible from the ... [ward's] point of view'") (Recommendation III-E Commentary) (quoting John Parry, A Unified Theory of Substitute Consent: Incompetent Patients' Right to Individual Health Care Decision-Making, 11 Mental & Physical Disability L. Rep. 378, 379 (1987)).
We discussed both tests in In re Grady, 85 N.J. 235, 426 A.2d 467 (1981), which involved a nineteen-year-old woman, Lee Ann Grady, who suffered from severe mental impairment caused by Downs Syndrome. Her parents sought to have her sterilized. Although we couched the opinion in terms of Lee Ann's right of procreative choice, id. at 244-50, 426 A.2d 467, we acknowledged that she was unable to make that choice, id. at 250, 426 A.2d 467. We concluded that on remand the trial court, as parens patriae, id. at 258-60, 426 A.2d 467, should make the choice in her best interests, id. at 251-52, 426 A.2d 467. We did "not pretend" that the choice made by the court for Lee Ann "would be her own choice." Id. at 261, 426 A.2d 467. Instead, we reasoned that "having the choice made in her behalf produces a more just and compassionate result than leaving Lee Ann with no way of exercising a constitutional right." Ibid.
Significantly, however, we also sought to protect Lee Ann's right to choose. Thus, we held that a court should apply the best-interest test only when her parents showed, by "clear and convincing evidence, that she was incapable of making the decision of whether to be sterilized for herself." Id. at 265, 426 A.2d 467.
Thus, Grady reflects the heavy burden on anyone seeking to overcome the right of self-determination of a person who is generally incompetent. Here, the trial court held that M.R.'s father, as the party propounding her specific capacity, bore the *169 burden of proof on that issue. We now hold that the court should have placed on M.R.'s mother, as the person challenging M.R.'s capacity to decide, the burden of proving specific incapacity by clear and convincing evidence.
Indeed, the distinctions between the present case and Grady lead us to grant enhanced respect to M.R.'s autonomy. First, Lee Ann Grady's mental impairment was severe, but M.R.'s impairment is moderate. The difference between them reminds us that developmentally-disabled people, like other people, can differ widely in their ability to make decisions. 85 N.J. at 265, 426 A.2d 467. Notwithstanding her impairment, M.R. appears capable of more choices than did Lee Ann. We are reminded also that the mere fact that a person is generally incompetent does not mean that person is incompetent for all purposes. Ibid. A person who is generally incompetent can still make choices about specific matters. Depending on the facts of the case, someone who is unable to manage his or her own affairs may still be capable of deciding where and with whom to live.
A second distinction between the present case and Grady concerns the seriousness of the incompetent's decision. The decision where to live, if proved incorrect, can be corrected more easily than can the decision to be sterilized. We recognize the argument that as a decision increases in importance, so should the right of the affected person to make that decision. We cannot, however, abandon our responsibility to those who cannot make decisions for themselves, particularly when those decisions are irreversible or may be reversed only with great difficulty. Our goal is to permit developmentally-disabled people to make as many decisions as possible, while protecting them from the harmful effects of bad decisions that they do not fully understand.
Finally, in the thirteen years that have intervened between Grady and this decision, we have witnessed mounting concern for the rights of the developmentally disabled. Both the United States Congress, see, e.g., 42 U.S.C. §§ 12101 to 12213 (establishing 1990 Americans with Disabilities Act, which prohibits discrimination *170 on basis of disability in employment, State and local government services, transportation, public accommodations, and communications); 29 U.S.C. § 792 (creating Architectural and Transportation Barriers Compliance Board to enforce Architectural Barriers Act of 1968, 42 U.S.C. §§ 4151 to 4157, and to investigate "alternative approaches to the architectural, transportation, communication, and attitudinal barriers confronting handicapped individuals"), and the New Jersey Legislature, see, e.g., N.J.S.A. 30:6D-1 to -22 (creating Developmentally Disabled Rights Act, which protects fundamental rights of developmentally disabled); N.J.S.A. 34:16-20 to -38 (establishing Vocational Rehabilitation Act, which promotes creation of vocational rehabilitation and independent living rehabilitation services for handicapped persons), have shown increasing sensitivity to the individual rights of the developmentally disabled. Furthermore, writing in the year after the Grady opinion, we recognized "the assumption that handicapped people are autonomous individuals entitled to the same rights and liberties as all other citizens." New Jersey Ass'n for Retarded Citizens, supra, 89 N.J. at 250, 445 A.2d 704.
Five years ago, sparked by the increasing number of elderly and developmentally-disabled people affected by guardianships, Agenda for Reform, supra, 13 Mental & Physical Disability L. Rep. at 274, the American Bar Association convened a National Guardianship Symposium. The symposium produced many recommendations that sought "to provide for the wards' needs while maximizing individual autonomy." Id. at 275. Among other recommendations, the symposium urged recognition that "incapacity may be partial or complete," id. at 310, and that "[t]he contemporaneous expressed wishes or spoken choice of the ward should be given due consideration," ibid. The symposium recommended a statutory presumption in favor of limited, rather than general, guardianships. Ibid. Similarly, the Uniform Probate Code, which has been adopted in fifteen states, allows limited guardianships for developmentally-disabled persons. U.P.C. § 5-306(c). Although New Jersey has enacted some provisions of that *171 code, it has not yet adopted the section concerning limited guardianships. Notwithstanding that omission, we suggest that trial courts consider appointing limited, rather than general, guardians in appropriate cases. A guardianship can be a "drastic" restraint on a person's liberty. Lommason v. Washington Trust Co., 140 N.J. Eq. 207, 209, 53 A.2d 175 (E. & A. 1947). In some situations, the need for a guardianship may be served adequately by a limited guardianship. The issue before us, however, is not whether M.R. needs a general, as distinguished from a limited, guardian, but rather whether we should sustain the decision that M.R.'s mother should serve as her guardian and that M.R. should live with her mother. Resolution of that issue, we believe, requires a remand to the Chancery Division for reconsideration of its decision in light of this opinion.
On remand, if M.R. again expresses a preference for living with her father, M.R.'s mother will bear the burden of proving by clear and convincing evidence that M.R. is not competent to make that choice. See Grady, supra, 85 N.J. at 265, 426 A.2d 467 (holding that proponent of sterilization has burden to prove by clear and convincing evidence that person to be sterilized lacks capacity to consent or withhold consent); In re Penny N., 120 N.H. 269, 414 A.2d 541, 543 (1980) (same); In re Hayes, 93 Wash.2d 228, 608 P.2d 635, 641 (1980) (finding that proponent of sterilization must show by "clear, cogent and convincing evidence" that procedure is in "retarded person's best interest"); cf. Addington v. Texas, 441 U.S. 418, 433, 99 S.Ct. 1804, 1813, 60 L.Ed.2d 323, 335 (1979) (holding that in civil-commitment cases, federal due-process clause requires only that proof be "greater than the preponderance-of-the-evidence standard"). If the trial court finds that M.R. lacks the specific capacity to decide where to live, M.R.'s father, as the party challenging the present status, would bear the burden of proving that a change in residence would be in M.R.'s best interest. See Sorentino v. Family & Children's Soc'y, 74 N.J. 313, 317, 378 A.2d 18 (1977) (holding that natural parents challenging adoptive parents' custody of child bore burden of proof *172 as party "seeking to alter the status quo of the child"); see also State v. Fields, 77 N.J. 282, 304 n. 9, 390 A.2d 574 (1978) (declaring that party seeking change in "presumptively valid status quo" of committed party bears burden of proof).
The parties understandably have assumed that M.R. will live with her general guardian. Even without the interrelationship between the choice of guardian and her place of residence, the choice of residence involves numerous other issues, including those pertaining to the availability of adequate educational, employment, and recreational facilities.
The purpose of the remand is to permit the trial court to reconsider the record in light of the standards set forth in this opinion. We leave to the sound discretion of the trial court whether, in light of the three years that have transpired since its original decision, the parties may supplement the record. Our remand does not suggest that the trial court should change its original decision. We direct only that the court reconsider the matter in light of this opinion.

-IV-
M.R.'s father contends that the hearing was unfair because M.R.'s appointed counsel did not zealously advocate her stated preference to live with him. That contention raises the question whether the role of appointed counsel for an incompetent is zealously to advocate the incompetent's position or simply to inform the court of counsel's perception of the incompetent's best interests.
The Rule pertaining to the duties of appointed counsel in guardianship proceedings provides:
Counsel shall be responsible to meet with the alleged incompetent; to make inquiry of persons having knowledge of the alleged incompetent's circumstances, his or her physical and mental state and his or her estate; and to file, in lieu of an Answer, a written report of findings and recommendations to the court at least three days prior to the hearing. [R. 4:86-4(b).]
*173 Consistent with that Rule, Mr. Hunczak interviewed M.R., her mother, and her father. His written report to the court concluded that M.R. was competent and that the court should give "considerable weight" to her choice to live with her father. After M.R.'s interview in chambers, however, Mr. Hunczak concluded that "less weight should be afforded to her choice to live with [her father]" than he had originally indicated and that either household would serve M.R.'s best interests.
Mr. Hunzcak's written report complied with Rule 4:86-4(b). Nonetheless, his change of position after the hearing draws our attention to the proper role of an attorney for an incompetent under that Rule. As we have recognized in other contexts, the attorney's role differs from that of a guardian ad litem. In the analogous context of child-custody cases, the Official Comment to Rules 5:8A and 5:8B provides:
The purpose of Rules 5:8A and 5:8B is to eliminate the confusion between the role of a court-appointed counsel for a child and that of a court-appointed guardian ad litem (GAL). The Supreme Court's Family Division Practice Committee in its 1987-1988 Annual Report distinguishes the roles.
A court-appointed counsel's services are to the child. Counsel acts as an independent legal advocate for the best interests of the child and takes an active part in the hearing, ranging from subpoenaing and cross-examining witnesses to appealing the decision, if warranted. If the purpose of the appointment is for legal advocacy, then counsel would be appointed.
A court-appointed guardian ad litem's services are to the court on behalf of the child. The GAL acts as an independent fact finder, investigator and evaluator as to what furthers the best interests of the child. The GAL submits a written report to the court and is available to testify. If the purpose of the appointment is for independent investigation and fact finding, then a GAL would be appointed. The GAL can be an attorney, a social worker, a mental health professional or other appropriate person.
These rules are not intended to expand the circumstances when such appointments are to be made; neither are these appointments to be made routinely.
Reports from two of our committees, the Judiciary Surrogates Liaison Committee and the Civil Practice Committee, shed light on the respective roles of an attorney and a guardian ad litem. As stated by the Judiciary Surrogates Liaison Committee, "[t]he role of the representative attorney is entirely different from that of a guardian ad litem. The representative attorney is a *174 zealous advocate for the wishes of the client. The guardian ad litem evaluates for himself or herself what is in the best interests of his or her client-ward and then represent[s] the client-ward in accordance with that judgment." Guidelines for Attorneys, supra, at 7.
Similarly, our Family Division Practice Committee has discussed the roles of counsel and guardian ad litem in proposing an amendment to the Official Comment to Rules 5:8A and 5:8B. The proposed amendment states in relevant part: "Attorneys acting on behalf of children in abuse or neglect cases and determination of parental rights cases should act as counsel for the child pursuant to Rule 5:8A rather than in the capacity of a [guardian ad litem] pursuant to Rule 5:8B." Family Division Practice Committee, Report (1994), reprinted in 3 N.J.L. 36 (1994) (1994 Report).
The committee explains:
The Committee believes that there is substantial confusion over the role of attorneys appointed on behalf of children in abuse or neglect cases and in termination of parental rights cases.
* * * * * * * *
... In termination of parental rights cases it is rare that an attorney appointed on behalf of a child is designated as either counsel pursuant to Rule 5:8A or as guardian ad litem pursuant to Rule 5:8B. As a result, the attorney frequently assumes a hybrid role, on the one hand offering legal argument, on the other hand, submitting a written report regarding investigative findings.
The Committee firmly believes that the role of an attorney in abuse or neglect cases and in termination of parental rights cases must be as an advocate for the child. Nothing short of zealous representation is adequate to protect a child's fundamental legal rights....
Requiring attorneys to act as counsel for children in these cases, does not deprive the court of the benefit of the type of assistance afforded by a guardian ad litem. Clearly, as counsel for the child, an attorney could request the additional appointment of a guardian ad litem, and the court sua sponte could do so if deemed necessary. Yet by clarifying an attorney's role as counsel for the child, substantial evidentiary and procedural dilemmas could be solved. Under the present situation where attorneys assume a hybrid role of attorney/social investigator, questions arise such as the right of the attorney to speak with the parties outside the presence of their counsel; whether communications between a child and the attorney are privileged; and whether an attorney who submits an investigative report is subject to cross-examination. Finally, having attorneys act as counsel for *175 children insures that they are being utilized for a role for which they are trained and suited.
[Ibid.]
In sum, several reasons support the distinction between an attorney and a guardian ad litem for an incompetent. First, the attorney and guardian ad litem may take different positions, with the attorney advocating a result consistent with the incompetent's preferences and the guardian urging a result that is different but in the incompetent's best interests. Second, the attorney and guardian may differ in their approaches. When interviewing interested parties, the attorney for an incompetent should proceed through counsel, but often a guardian ad litem may communicate directly with other parties. Finally, a guardian may merely file a report with the court, but the attorney should zealously advocate the client's cause.
Although we recognize the differences between minors and incompetents, we believe that many of the same considerations that prompted the Family Division Practice Committee to recommend an advocacy role for the attorney for a minor apply also to the attorney for an incompetent. Accordingly, we now request that committee to consider comparable amendments to Rule 4:86. At present, the Rule does not require the appointment of both an attorney and a guardian ad litem. Nor may every case require both in the future. In some cases, however, an incompetent, like a minor, may need both an attorney and a guardian ad litem.
For now we are guided by the Rules of Professional Conduct (RPC), which mandate that an attorney representing a disabled person should maintain, as much as possible, a normal attorney-client relationship with that person. RPC 1.14 provides:
(a) When a client's ability to make adequately considered decisions in connection with the representation is impaired, whether because of minority, mental disability or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.
(b) A lawyer may seek the appointment of a guardian, or take other protective action with respect to a client, only when the lawyer reasonably believes that the client cannot adequately act in the client's own interest.
*176 Ordinarily, an attorney should "abide by [the] client's decisions concerning the objectives of representation," RPC 1.2(a), and "act with reasonable diligence ... in representing [the] client," RPC 1.3. The attorney's role is not to determine whether the client is competent to make a decision, but to advocate the decision that the client makes. That role, however, does not extend to advocating decisions that are patently absurd or that pose an undue risk of harm to the client.
An adversarial role for the attorney recognizes that even if the client's incompetency is uncontested, the client may want to contest other issues, such as the identity of the guardian or, as here, the client's place of residence. Agenda for Reform, supra, 13 Mental & Physical Disability L. Rep. at 284. With proper advice and assistance, the developmentally-disabled client may be able to participate in such a decision. See id. at 285 (commenting on Recommendation II-C and quoting American Bar Association Model Rules of Professional Conduct (1983), Rule 1.14, Client Under a Disability). From this perspective, the role of an attorney for a developmentally-disabled person is like that of an attorney representing any other client.
Advocacy that is diluted by excessive concern for the client's best interests would raise troubling questions for attorneys in an adversarial system. An attorney proceeds without well-defined standards if he or she forsakes a client's instructions for the attorney's perception of the client's best interests. Lawrence A. Frolik, Plenary Guardianship: An Analysis, A Critique and A Proposal for Reform, 23 Ariz.L.Rev. 599, 635 (1981). Further, "if counsel has already concluded that his client needs `help,'" he is more likely to provide only procedural formality, rather than vigorous representation. Id. at 634-35; see also Maria M. Das-Neves, Note, The Role of Counsel in Guardianship Proceedings of the Elderly, 4 Geo. J. Legal Ethics 855, 863 (1991) (stating that "[i]f the attorney is directed to consider the client's ability to make a considered judgment on his or her own behalf, the attorney essentially abdicates his or her advocate's role and leaves the *177 client unprotected from the petitioner's allegations"). Finally, the attorney who undertakes to act according to a best-interest standard may be forced to make decisions concerning the client's mental capacity that the attorney is unqualified to make. Frolik, supra, 23 Ariz.L.Rev. at 635.
In the related context of civil commitment proceedings, other jurisdictions have mandated that counsel zealously protect the wishes of the proposed ward. See Lynch v. Baxley, 386 F. Supp. 378, 389 (M.D.Ala. 1974) (finding that proposed ward has right "to representative counsel occupying a traditional adversarial role"); Lessard v. Schmidt, 349 F. Supp. 1078, 1099 (E.D.Wis. 1972) (holding that appointing non-adversarial guardian ad litem did not "satisfy the constitutional requirement of representative counsel"), vacated on other grounds, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974); In re Link, 713 S.W.2d 487, 496 (Mo. 1986) (holding that appointed counsel must "act as an advocate" for proposed ward); Quesnell v. State, 83 Wash.2d 224, 517 P.2d 568, 576 (1974) (noting that guardian ad litem must make "affirmative effort to provide protection ... for the fundamental rights of the alleged mentally ill ward"); State ex rel Hawks v. Lazaro, 157 W. Va. 417, 202 S.E.2d 109, 126 (1974) (declaring that guardian ad litem must "represent his client as zealously as the bounds of ethics permit"). In Link, supra, the Supreme Court of Missouri discussed the role of appointed counsel in guardianship proceedings and concluded that "to the extent an affected individual appropriately understands what is at stake and expresses a desire to waive or exercise a particular right, that desire must be honored, even if counsel disagrees with the wisdom of the choice." 713 S.W.2d at 496.
Until such time as we amend Rule 4:86, we offer the following guidelines to assist the attorney for an incompetent. First, a declaration of incompetency does not deprive a developmentally-disabled person of the right to make all decisions. The primary duty of the attorney for such a person is to protect that person's rights, including the right to make decisions on specific matters. Generally, the attorney should advocate any decision *178 made by the developmentally-disabled person. On perceiving a conflict between that person's preferences and best interests, the attorney may inform the court of the possible need for a guardian ad litem. See 1994 Report, supra, 3 N.J.L. at 36 (noting Comment to proposed amendment to Rules 5:8A and 5:8B). Our endeavor is to respect everyone's right of self-determination, including the right of the developmentally disabled. For those who cannot exercise that right, the courts will protect their best interests.
Finally, we are requesting the Administrative Office of the Court to arrange for training for judges when communicating with developmentally-disabled people. Consistent with the recommendation of the ABA symposium, we believe that continuing judicial education should include training in "the skills required to effectively communicate with disabled and elderly persons...." Agenda for Reform, supra, 13 Mental & Physical Disability L. Rep. at 309; see also Deborah I. Dawson & Daniel E. Goldman, Advocating Alone for the Developmentally Disabled, 131 N.J.L.J. 78 (1992) (discussing techniques for attorneys when interviewing developmentally-disabled people).

-V-
This case arises in the unusual context of a dispute between the mother and father of a developmentally-disabled adult daughter, both of whom want to serve as her guardian and provide her place of residence. On remand, the primary issue will be whether M.R. is competent to express a reliable preference where to live. If the court finds that she is competent, it should honor her preference. If not, the court should determine the place of residence according to M.R.'s best interests. Her attorney's role should be to advocate her choice, as long as it does not pose unreasonable risks for her health, safety, and welfare. If the court concludes that M.R. is incapable of deciding where to live, it may appoint a guardian ad litem to represent her best interests. The court, however, may conclude that it can protect M.R.'s best interests without appointing *179 a guardian ad litem. Accordingly, we remit to the sound discretion of the trial court whether the appointment of a guardian ad litem is necessary.
We affirm the declaration of incompetency, reverse the designation of M.R.'s mother as her guardian, and remand the matter to the Chancery Division. Pending the outcome of the remand, M.R. shall continue to reside with her mother, subject to the visitation rights of M.R.'s father as provided in the judgment of the Chancery Division.
For affirmance and remandment  Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN  7.
Opposed  None.