687 A.2d 349

IN THE MATTER OF CLEMENTINE ROCHE,
AN ADJUDICATED INCOMPETENT.

Superior Court of New Jersey
Chancery Division Essex County
Probate Part

September 3, 1996.

*Ruth Charbonneau,* General Counsel, for plaintiff.

*Patricia H. Kotyk–Zalisko,* Public Guardian for Elderly Adults.

ROSEMARY HIGGINS CASS, J.S.C.

Plaintiff, Patricia H. Kotyk–Zalisko, Public Guardian for Elderly Adults and guardian of Clementine Roche, brought this matter before the court by notice of motion for instructions pursuant to *R.* 4:95–2. Plaintiff asks the court to order that an advance directive executed by Clementine Roche on May 31, 1995 is valid and binding upon herself as guardian and upon all health care providers unless otherwise revoked or amended. However, if the court will not validate the advance directive, plaintiff asks for direction as to the weight she should give to this document in making future medical decisions on behalf of her ward.

I.

Clementine Roche was adjudicated incompetent and found specifically unable to consent to medical treatment by judgment of February 11, 1993. At the time, she was diagnosed with senile dementia with delusions. The Public Guardian was appointed for her as there were no family members willing or able to undertake this responsibility.

Mrs. Roche, who had been in Clara Maass Medical Center, was subsequently transferred to the Greenhill Nursing Home, West Orange, New Jersey, where she has remained to the present. On May 16, 1995 and May 31, 1995, she was visited by Patricia H. Kotyk–Zalisko, Public Guardian for Elderly Adults, and Judith Sakofsky–Englander, a case manager for the Office of the Public Guardian for Elderly Adults. They discussed medical preferences with her, and she said that she did not want feeding/hydration tubes or CPR under any circumstances. She also indicated that if she could not breathe properly, the doctors should try to provide oxygen to resuscitate her.

On May 31, 1995, with plaintiff and Judith Sakofsky–Englander as witnesses, Clementine Roche purportedly executed an advance directive setting forth her preference for not receiving cardiac resuscitation or artificial feeding. Plaintiff and Judith Sakofsky–Englander believe that Mrs. Roche had sufficient mental capacity to understand the consequences of executing the advance directive. Dr. Mervin Olinger, the Director of the Greenhill Nursing Home, examined her on April 4, 1996, and also asserted that she clearly understood the nature and effect of the advance directive.

Plaintiff does not argue that her ward has returned to competency, but instead asks for validation of the advance directive of this adjudicated incompetent. The issue in this case, thus, is whether a person adjudicated a mental incompetent, for whom a general guardian has been appointed, may thereafter execute a valid advance directive.

## II.

In New Jersey, competent persons are entitled to a free range of choices as to their medical care, and generally, they may choose to terminate any medical treatment, even life-sustaining medical treatment. *In re M.R.,* 135 *N.J.* 155, 167, 638 *A.*2d 1274 (1994); *In re Conroy,* 98 *N.J.* 321, 347, 486 *A.*2d 1209 (1985). The right to make decisions regarding medical treatment and bodily integrity is embraced in the federal constitutional right of privacy first set forth in *Griswold v. Connecticut,* 381 *U.S.* 479, 85 *S.Ct.* 1678, 14 *L.Ed.*2d 510 (1965), and the right of all persons to refuse life-sustaining medical treatment is included in the common-law right of self-determination. *Conroy, supra,* 98 *N.J.* at 348, 486 *A.*2d 1209. The right to refuse life-sustaining medical treatment is limited, however, by four state interests: 1) preserving life, 2) preventing suicide, 3) safeguarding the integrity of the medical profession and 4) protecting innocent third parties. *Id.* at 348–49, 486 *A.*2d 1209.

■ Incompetent persons have a common-law right of self-determination, the same as that of competent persons, except that the right of self-determination of adjudicated incompetents must be balanced by the court with concern for their best interests. *M.R., supra,* 135 *N.J.* at 167, 638 *A.*2d 1274. This is because an adjudicated incompetent, "like a minor child, is a ward of the state, and the state's *parens patriae* power supports the authority of its courts to allow decisions to be made for an incompetent that serve the incompetent's best interests." *Conroy, supra,* 98 *N.J.* at 364–65, 486 *A.*2d 1209. The decision maker's responsibility is to carefully balance the incompetent's right to self-determination with considerations of best interests and the protection of the incompetent's person and property. *See M.R., supra,* 135 *N.J.* at 167, 638 *A.*2d 1274.

■ The incompetent's right to self-determination must be preserved to the extent possible. Some elderly nursing home patients, who are generally incompetent and unable to govern their own affairs, have lucid periods during which they can once again communicate their wishes clearly. *See Conroy, supra,* 98 *N.J.* at 382, 486 *A.*2d 1209. Even those who are generally incompetent vary widely in their degree of alertness and in their ability to communicate. Thus, a patient may be competent to make a decision regarding a course of medical treatment "even if the patient previously had been adjudicated an incompetent and had a general guardian appointed pursuant to *N.J.S.A.* 3B:12–25." *Id.*

■ If a patient is not competent to make a particular decision, the guardian has a duty to determine subjectively, to the extent possible, the course an incompetent would have taken regarding a particular decision if competent and apply a substituted judgment or subjective test. *Conroy, supra,* at 361–64, 486 *A.*2d 1209. If some trustworthy evidence of an incompetent's intent can be found, but not enough to fully determine subjective intent, this can be taken into account in determining the incompetent's best interests, and a limited-objective test should be used. *M.R., supra,* 135 *N.J.* at 167, 638 *A.*2d 1274; *Conroy, supra,* 98

*N.J.* at 365–66, 486 *A.*2d 1209. Under this limited-objective test, life-sustaining treatment may be withdrawn if "there is some trustworthy evidence that the patient would have refused the treatment, and the decision-maker is satisfied that it is clear that the burdens of the patient's continued life with the treatment outweigh the benefits of that life for him." *Id.* at 365, 486 *A.*2d 1209. If no reliable evidence of an incompetent's subjective intent exists, the decision maker should use a pure-objective test, or best interests test, under which, as in the limited-objective test, the net burdens of the patient's life with the treatment should clearly outweigh the benefits that the patient derives from life, if the guardian is to deny or withdraw treatment. *M.R., supra,* 135 *N.J.* at 167–68, 638 *A.*2d 1274; *Conroy, supra,* 98 *N.J.* at 366–67, 486 *A.*2d 1209. The substituted judgment test and the best interests test "represent points on a continuum of subjective and objective information leading to a reliable decision that gives as much weight as possible to the right of self-determination." *M.R., supra,* 135 *N.J.* at 167–68, 638 *A.*2d 1274.

### III.

In this case, plaintiff does not ask the court to allow her ward to make a current and particular medical decision for herself, but seeks to validate Clementine Roche's attempted assertion of the statutory right to complete an advance directive pursuant to the New Jersey Advance Directives for Health Care Act (Advance Directives Act), *N.J.S.A.* 26:2H–53 to –78.[1] This legislation was enacted to allow "competent adults to plan ahead for health care decisions through the execution of advance directives," because

---

[1] Interestingly, on January 17, 1985, seven years before the Advance Directives Act went into effect, the Court in *Conroy, supra,* 98 *N.J.* at 344, 486 *A.*2d 1209, noted the need for the Legislature to formulate "clear standards for resolving requests to terminate life-sustaining treatment for incompetent patients." The Court opined that in resolving complex moral issues, such as the legal effect which should be given to "living wills," the Legislature as an elected body is "better able than any other single institution to reflect the social values at stake." *Id.* at 344–45, 344 n. 2, 486 *A.*2d 1209.

the Legislature determined that "the right to control decisions about one's own health care should not be lost in the event a patient loses decision making capacity and is no longer able to participate actively in making his own health care decisions." *N.J.S.A.* 26:2H–54(c).

The Advance Directives Act authorizes a declarant to execute an advance directive at any time. *N.J.S.A.* 26:2H–56. The term "declarant" is defined in the Act as "a competent adult who executes an advance directive." *N.J.S.A.* 26:2H–55. The term "advance directive" may include a "proxy directive," which is "a writing which designates a health care representative in the event the declarant subsequently lacks decision making capacity," an "instruction directive," which is "a writing which provides instructions and direction regarding the declarant's wishes for health care in the event that the declarant subsequently lacks decision making capacity," or both. *Id.* The advance directive which Clementine Roche attempted to execute is an instruction directive.

The Advance Directives Act specifically authorizes declarants to execute advance directives, whether they fit into the category of proxy directives, instruction directives or both. *N.J.S.A.* 26:2H–56, –58. It also gives declarants the right to reaffirm, modify or revoke advance directives, and any declarant may revoke an advance directive through the means described in *N.J.S.A.* 26:2H–57(b):

(1) Notification, orally or in writing, to the health care representative, physician, nurse or other health care professional, or other reliable witness, or by any other act evidencing an intent to revoke the document; or

(2) Execution of a subsequent proxy directive or instruction directive, or both, in accordance with section 4 of this act.

This legislation specifically permits incompetent persons, in *N.J.S.A.* 26:2H–57(d), to suspend advance directives by the means set forth in paragraph (1) of subsection (b). Incompetents are excluded from executing a subsequent advance directive in accordance with *N.J.S.A.* 26:2H–57(b)(2), but can, however, reinstate their advance directives, once suspended, by "oral or written notification to the health care representative, physician, nurse or

other health care professional of an intent to reinstate the advance directive." *N.J.S.A.* 26:2H–57(d).[2]

## IV.

■ I find that once a person has been adjudicated incompetent, he or she can no longer exercise the right to execute an advance directive pursuant to the Advance Directives Act. Clearly the Legislature intended to give the right to execute advance directives to competent persons, declarants who may someday lose decision making capacity, and not to incompetent persons who already have lost independence. *N.J.S.A.* 26:2H–54. The Legis-

---

[2] The complete text of section 57 of the Advance Directives Act reads as follows:

**26:2H–57. Reaffirming, modifying and revoking an advance directive**

a. A declarant may reaffirm or modify either a proxy directive, or an instruction directive, or both. The reaffirmation or modification shall be made in accordance with the requirements for execution of an advance directive pursuant to section 4 of this act.

b. A declarant may revoke an advance directive, including a proxy directive, or an instruction directive, or both, by the following means:

(1) Notification, orally or in writing, to the health care representative, physician, nurse or other health care professional, or other reliable witness, or by any other act evidencing an intent to revoke the document; or

(2) Execution of a subsequent proxy directive or instruction directive, or both, in accordance with section 4 of this act.

c. Designation of the declarant's spouse as health care representative shall be revoked upon divorce or legal separation, unless otherwise specified in the advance directive.

d. An incompetent patient may suspend an advance directive, including a proxy directive, an instruction directive, or both, by any of the means stated in paragraph (1) of subsection b. of this section. An incompetent patient who has suspended an advance directive may reinstate that advance directive by oral or written notification to the health care representative, physician, nurse or other health care professional of an intent to reinstate the advance directive.

e. Reaffirmation, modification, revocation or suspension of an advance directive is effective upon communication to any person capable of transmitting the information including the health care representative, the attending physician, nurse or other health care professional responsible for the patient's care.

[*N.J.S.A.* 26:2H–57 (footnote omitted).]

lature defined a declarant as a competent person and demonstrated its consideration of incompetent persons through provisions allowing them to suspend their advance directives.[3]

Clementine Roche, as an adjudicated incompetent, cannot execute a valid and enforceable advance directive. It is too late for Mrs. Roche, whatever degree of lucidity she may have regained, to execute an advance directive, as she is not a competent person, and her guardian does not assert that she should be so found. There is no need to provide for a time when Clementine Roche may be found incompetent; the time is already upon us.

 An issue still remains to be decided, however, as plaintiff has asked for instruction as to the effect she, as guardian, should give to the paper executed by her ward if it is not found to be a valid advance directive. Clementine Roche is an elderly nursing home patient, and in the not too distant future, plaintiff, as her guardian, is likely to face difficult medical decisions. If a medical situation arises and Mrs. Roche is specifically unable to make a medical decision, it will be plaintiff's responsibility, as her guardian, to gather evidence to ascertain the subjective decision which she would have made if competent.[4]

---

[3] The Advance Directives Act provides an anomaly in its treatment of incompetents; for if they have executed advance directives while competent, they may suspend and reinstate these advance directives, but if they have not executed advance directives while competent, they may not, once adjudicated incompetent, execute a valid advance directive. See N.J.S.A. 26:2H–57. This gives incompetents a certain degree of autonomy with regard to pre-determined health care decisions, but prohibits them from enjoying the full benefit of the statute. Resolution of this anomaly is not, however, necessary for the determination herein as what the court was asked to do was rule on the validity of the alleged advance instruction directive.

[4] Once an appropriate guardian has been appointed, it is the guardian's responsibility to make decisions regarding a ward's medical care using either a subjective, limited-objective or pure-objective test as the facts warrant. Conroy, supra, 98 N.J. at 381, 385, 486 A.2d 1209. Under usual circumstances, "court involvement will be limited to the determination of incompetency, and the appointment of a guardian unless a personal guardian has been previously

The Court in *Conroy, supra,* 98 *N.J.* at 361, 486 *A.*2d 1209, set forth the types of evidence which a guardian may consider in attempting to determine his or her ward's subjective intent. For instance, intent may be found in a written document, such as a "living will," which states "that person's desire not to have certain types of life-sustaining treatment administered under certain circumstances." *Id.* Such intent may also be found "in an oral directive that the patient gave to a family member, friend, or health care provider." *Id.* The Court also noted that intent can be found in a durable power of attorney, in reactions the patient expressed regarding medical treatment administered to others, in the patient's religious beliefs and from the patient's consistent pattern of conduct with respect to prior decisions regarding his or her own medical care. *Id.* at 361–62, 486 *A.*2d 1209.

Clearly, the Court intended the guardian of an incompetent to consider a wide variety of types of information in ascertaining the subjective intent of the ward with respect to a particular medical decision. Although advance directives executed by incompetent persons can have no binding effect on health care providers, I hold that if the incompetent clearly understood the nature and effect of the advance directive at the time it was executed, this document may be considered as evidence of the incompetent's subjective intent. Of course, the guardian must carefully consider and weigh all other probative evidence in making such a determination.

An appropriate order shall be provided by the attorney for plaintiff under the five day rule.

---

appointed, who will determine whether the standards [which the Court] prescribed have been satisfied." *Id.* at 385, 486 *A.*2d 1209.