SYLLABUS

This syllabus is not part of the Court's opinion.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Court.  In the interest of brevity, portions of an opinion may not have been summarized.

## S.T. v. 1515 Broad Street, LLC (A-87-18) (081916)

**Argued November 6, 2019 -- Decided March 9, 2020**

**ALBIN, J., writing for the Court.**

Only when, through proper legal procedures, a court determines that a litigant lacks the mental capacity to govern her affairs may the litigant be deprived of the right to decide the destiny of her lawsuit.  In this appeal, the Court considers whether the trial court adhered to those procedures when it empowered a guardian ad litem to make "any and all decisions regarding the ultimate disposition of this case, whether by trial or settlement," on behalf of plaintiff S.T. without ever conducting a guardianship hearing.

On March 11, 2008, S.T. was a forty-four-year-old chemical engineer fluent in four languages.  She came to this country as a teenage refugee from Vietnam and later served in the United States Army.  She held a bachelor's degree in chemical engineering and master's degrees in both chemical engineering and environmental sciences.  On the evening of March 11, S.T. was working as a chemical engineer at ABB Lummis Global, located at 1515 Broad Street in Bloomfield, N.J.  While exiting the building, S.T. was struck in the head by a metal plate that fell from above the building's doorway.  The next day, she went to the hospital, was diagnosed with a concussion, and was given intravenous medications for the pain.  That was the first of more than 500 visits S.T. made to healthcare providers to address a constellation of conditions related to her claim that she suffered a traumatic brain injury.

One year after the accident, the Social Security Administration declared S.T. permanently disabled and awarded her permanent disability benefits.  A clinical psychologist diagnosed S.T. as suffering from cognitive, anxiety, and depressive disorders and opined that S.T.'s cognitive impairment is "expected to be a chronic and permanent condition."  A forensic psychiatrist diagnosed S.T. as suffering from such conditions as post-concussion syndrome, major depressive disorder, post-traumatic migraine disorder, intracranial hypertension, and left trigeminal neuralgia and found those conditions to be "causally related to the accident and . . . permanent in nature."  A 2013 psychological report indicated that S.T.'s "[m]easures of verbal comprehension . . . suggest[ed] a superior level of receptive language functions" and that her "measures of nonverbal domains including memory, spatial processing and nonverbal abstract reasoning" were above average.  On the other hand, her speed in processing complex information remained impaired.

1

In February 2010, S.T. filed a civil complaint alleging that she suffered serious injuries resulting from the negligence of the building owner and other purported responsible parties. In July 2013, defendants filed an offer of judgment in the amount of $475,000 to settle the case. S.T. rejected the offer against the advice of her attorney.

Because the attorney believed that S.T. suffered from a diminished mental capacity and that her rejection of defendants' offer was not in her best interests, he applied to the trial court for the appointment of a guardian ad litem and arranged for the forensic psychologist to examine S.T. again. The doctor opined that S.T. "shows a diminished capacity to fully consider the risks of her decisionmaking in regard to how to proceed with the case." S.T. later asserted that she was not advised of the purpose of the examination.

The court appointed attorney Frederick Miceli as a guardian ad litem and then ceded to him the authority to determine whether S.T. had the mental capacity to make an informed decision on whether to accept or reject a settlement offer. Miceli reviewed the "extensive case materials," including the discovery and medical records, and interviewed S.T. twice in person and once over the telephone. He finally expressed his opinion that a guardian ad litem should be entrusted with the authority to decide for S.T. whether the case should be resolved by trial or settlement. Without conducting a guardianship hearing, the court entered an order empowering Miceli to make "all decisions regarding the ultimate disposition of this case, whether by trial or settlement in accordance with the powers of a Guardian Ad Litem as set forth in the Rules of Court."

Without S.T.'s consent, an agreement was reached among the parties to settle the lawsuit for the sum of $625,000. The court conducted a "friendly hearing" to assess the reasonableness and fairness of the settlement and to determine whether to approve it. Based on the recommendation of the guardian ad litem and S.T.'s personal-injury attorney, the court accepted a settlement of the lawsuit against S.T.'s forceful objections.

The Appellate Division affirmed the judgment of the trial court and the procedures that led to the approval of the settlement. 455 N.J. Super. 538, 548-49 (App. Div. 2018). The Court granted S.T.'s petition for certification. 238 N.J. 437 (2019).

**HELD:** Before depriving S.T. of the right to control the direction of her case and appointing a guardian to make legal decisions on her behalf, the court was required to conduct a hearing to determine whether she lacked "sufficient capacity to govern [herself] and manage [her] affairs" "by reason of mental illness or intellectual disability." See N.J.S.A. 3B:1-2; N.J.S.A. 3B:12-24; R. 4:86-4. At such a hearing, S.T. had the right to independent counsel. See R. 4:86-4(a)(7). In the absence of a guardianship hearing and a judicial finding by clear and convincing evidence that S.T. lacked the requisite mental capacity to decide how to proceed with her lawsuit, the court had no authority to accept a settlement against S.T.'s wishes.

2

1. Generally, a lawyer agrees to pursue the goals of a client to the extent the law permits, even when the lawyer believes that the client's desires are unwise. RPC 1.14(b) presents an exception to that rule; it permits a lawyer who "reasonably believes that the client has diminished capacity, is at risk of substantial . . . financial . . . harm unless action is taken and cannot adequately act in the client's own interest" to "take reasonably necessary protective action, including . . . , in appropriate cases, seeking the appointment of a guardian ad litem." The Court does not question that S.T.'s attorney acted in good faith when he requested the appointment of a guardian ad litem. S.T.'s counsel, however, erred in not copying his client on the motion for the appointment of a guardian ad litem. The Court agrees with the Appellate Division that when "counsel for an alleged mentally incapacitated person makes a motion to appoint a [guardian ad litem]," the motion must be served on that person. See 455 N.J. Super. at 560 n.3. (pp. 23-25)

2. The Court also finds that the trial court, after reviewing S.T.'s counsel's certification along with the attached expert medical reports, properly exercised its discretion in appointing a guardian ad litem. The court's order, however, should have cited the basis of the court's authority and made clear the role to be played by the guardian ad litem. The Court explains that the interplay between Rule 4:26-2 and Rule 4:86 is critical to an understanding of how this case should have proceeded. (p. 25)

3. Paragraph (b) of Rule 4:26-2 sets forth the initial procedure that follows when a person is alleged to be mentally incapacitated. Under Rule 4:26-2(a), a guardian for a "mentally incapacitated person" is authorized to prosecute a legal action on her behalf. In contrast, the role of a guardian ad litem for an "alleged mentally incapacitated person" under Rule 4:26-2(b) is more limited: to act as an independent investigator and inform the court on the subject of the client's mental capacity. The Court acknowledges that this rule is not a model of clarity and notes that the interpretive mistakes made by both the trial court and Appellate Division might have been avoided if the language of the rule was more precise. The Court requests that the Supreme Court Civil Practice Committee review Rule 4:26-2 in light of this opinion. (pp. 25-28)

4. After completing its inquiry under Rule 4:26-2(b), the guardian ad litem submits a report to the court containing the results of the investigation and recommends whether a formal hearing should proceed under Rule 4:86. The guardian ad litem's recommendations are not binding on the court; ultimately the court must make its own independent factfindings. The court should not cede its responsibility and authority as the decisionmaker to the guardian ad litem. Nothing in New Jersey's court rules, statutes, or case law suggests that a guardian ad litem appointed to investigate a client's alleged mental incapacity has the power to make legal decisions for the client before a judicial determination on her mental capacity. In this case, Miceli recommended to the court that he be given the authority to decide whether S.T.'s case should be resolved by trial or settlement. Without affording S.T. notice or a hearing and without making a judicial determination that S.T. was a mentally incapacitated person, the court ceded to Miceli the

3

power to make "all decisions regarding the ultimate disposition of this case, whether by trial or settlement." By abdicating the Judiciary's nondelegable oversight and factfinding function, the trial court did not proceed in the constitutional manner prescribed by both Rule 4:86-1 to -8 and N.J.S.A. 3B:12-24 to -35 for the appointment of a guardian of an alleged mentally incapacitated person. (pp. 28-31)

5. An action for guardianship of an alleged incapacitated individual and the proceedings required for a judgment of incapacity are governed by court rule and statute. R. 4:86-1 to -8; N.J.S.A. 3B:12-24 to -35. Rigorous procedural safeguards protect the subject of a guardianship hearing because a finding of incapacity results in an individual's loss of the right of self-determination. The procedural steps required by New Jersey court rules or statutes were not followed in this case: a guardianship complaint with notice to S.T., accompanied by the affidavits of qualified medical professionals, was never filed; a hearing with the taking of testimony, with S.T. represented by independent counsel, was never conducted; factfindings by the trial court based on clear and convincing evidence were never made; and S.T. was never adjudicated by the court as a mentally incapacitated person. The trial court ceded its judicial function, outsourcing to the guardian ad litem the role of final arbiter of S.T.'s capacity. The issue is not whether there was clear and convincing evidence of S.T.'s incapacity in the record, as the Appellate Division found. See 455 N.J. Super. at 560, 563-64. The issue is that the trial court failed to conduct the hearing -- either a jury or bench trial -- with the due process safeguards required by our court rules and statutes. (pp. 31-33)

6. Rule 4:44-3 provides that "[a]ll proceedings to enter a judgment to consummate a settlement in matters involving . . . mentally incapacitated persons shall be heard by the court without a jury" and that "[t]he court shall determine whether the settlement is fair and reasonable." Such a proceeding is called a "friendly hearing." But there was no judicial finding that S.T. was mentally incapacitated in accordance with our court rules and statutes. Without such a finding, the trial court had no authority to conduct a friendly hearing under Rule 4:44-3 or to deny S.T. the right to determine for herself whether to accept a settlement in her case. (pp. 34-35)

7. The Court notes that an additional issue was raised by one defendant: whether the complaint filed against that defendant is barred by the statute of limitations. The Court explains why it declines to pass judgment on or remand that issue. (p. 36)

**The judgment of the Appellate Division is REVERSED, the settlement approved by the trial court is VACATED, and the matter is REMANDED.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, FERNANDEZ-VINA, and SOLOMON join in JUSTICE ALBIN's opinion. JUSTICES PATTERSON and TIMPONE did not participate.**

4

SUPREME COURT OF NEW JERSEY
A-87 September Term 2018
081916

S.T.,

Plaintiff-Appellant,

v.

1515 Broad Street, LLC,
The Walsh Company, LLC,
and County Glass & Metal
Installers, Inc.,

Defendants-Respondents,

and

County Glass & Metal Installers, Inc.,

Third-Party Plaintiff-Respondent,

v.

Virginia Glass Products,

Third-Party Defendant,

and

IDESCO Corp.,

Third-Party Defendant-Respondent.

1

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
455 N.J. Super. 538 (App. Div. 2018).

Argued
November 6, 2019

Decided
March 9, 2020

Charles Dawkins, Jr. argued the cause for appellant
(Law Office of Charles Dawkins, Jr., attorneys;
Charles Dawkins, Jr., of counsel and on the briefs).

Peter A. Gaudioso argued the cause for respondent
County Glass & Metal Installers, Inc. (McElroy,
Deutsch, Mulvaney & Carpenter, attorneys; Peter A.
Gaudioso, of counsel and on the briefs, and Cassandra
J. Neugold, on the briefs).

Gerard H. Hanson argued the cause for respondent
Idesco Corp. (Hill Wallack, attorneys; Gerard H.
Hanson, of counsel and on the briefs, and Victoria J.
Airgood, on the briefs).

Matthew S. Mahoney argued the cause for respondent
1515 Broad Street, LLC (Law Offices of Linda S.
Baumann, attorneys; Matthew S. Mahoney, on the
briefs).

JUSTICE ALBIN delivered the opinion of the Court.

An individual's right to determine how best to pursue her personal and financial affairs -- and the fate of her lawsuit -- is so fundamental that it is embedded in our State Constitution and our laws. See In re M.R., 135 N.J. 155, 166-67 (1994). That right is recognized in our Rules of Professional

Conduct, which command lawyers to "abide by a client's decisions concerning the scope and objectives of representation" and "abide by a client's decision whether to settle" or proceed with a lawsuit. See RPC 1.2(a). Lawyers and judges may conclude that a client's decision to turn down a settlement offer is mistaken or even foolish, but in a system of justice that respects the right of every individual to control her personal destiny, the client's decision must be honored.

Only when, through proper legal procedures, a court determines that a litigant lacks the mental capacity to govern her affairs may the litigant be deprived of the right to decide the destiny of her lawsuit. Those essential principles are at the heart of the case before us.

Plaintiff S.T. allegedly suffered a serious injury when, as she exited the building where she worked, an object from above the building's door fell and struck her on the head. The injuries, she asserts, have severely impaired all aspects of her life, including her career. She filed a personal-injury lawsuit against the building owner and other purported responsible parties. S.T. rejected defendants' offer of judgment against the advice of her attorney. Because the attorney believed that S.T. suffered from a diminished mental capacity and that her rejection of defendants' offer was not in her best

3

interests, he applied to the trial court for the appointment of a guardian ad litem.

The court appointed a guardian ad litem and then ceded to the guardian ad litem the authority to determine whether S.T. had the mental capacity to make an informed decision on whether to accept or reject a settlement offer. Based on the recommendation of the guardian ad litem and S.T.'s personal-injury attorney, the court accepted a settlement of the lawsuit against S.T.'s forceful objections.

The Appellate Division affirmed the judgment of the trial court and the procedures that led to the approval of the settlement. S.T. v. 1515 Broad St., LLC, 455 N.J. Super. 538, 548-49 (App. Div. 2018).

We now reverse. The trial court erroneously granted the guardian ad litem the power to make "any and all decisions regarding the ultimate disposition of this case, whether by trial or settlement" without ever conducting a guardianship hearing.

Before depriving S.T. of the right to control the direction of her case and appointing a guardian to make legal decisions on her behalf, the court was required to conduct a hearing to determine whether she lacked "sufficient capacity to govern [herself] and manage [her] affairs" "by reason of mental illness or intellectual disability." See N.J.S.A. 3B:1-2; N.J.S.A. 3B:12-24; R.

4

4:86-4. At such a hearing, S.T. had the right to independent counsel. See R. 4:86-4(a)(7). In the absence of a guardianship hearing and a judicial finding by clear and convincing evidence that S.T. lacked the requisite mental capacity to decide how to proceed with her lawsuit, the court had no authority to accept a settlement against S.T.'s wishes.

We therefore vacate the settlement and remand the case to the trial court for further proceedings.

## I.

## A.

The record is derived from the discovery in S.T.'s personal-injury lawsuit, the pleadings and medical reports filed with the motion for the appointment of a guardian ad litem, and the proceedings related to the settlement of the personal-injury case.

On March 11, 2008, S.T. was a forty-four-year-old chemical engineer fluent in four languages. She came to this country as a teenage refugee from Vietnam and later served in the United States Army. She held a bachelor's degree in chemical engineering and master's degrees in both chemical engineering and environmental sciences.

On the evening of March 11, S.T. was working as a chemical engineer at ABB Lummis Global, located at 1515 Broad Street in Bloomfield, N.J. While

5

exiting the building, S.T. was struck in the head by a metal plate that fell from above the building's doorway. Immediately after the impact, a security guard and maintenance worker offered to call an ambulance, but S.T. declined help. As S.T. drove home, she experienced double vision and "a severe left-sided headache with swelling of the left jaw, as well as pain behind the left eye and within the left ear." The next day, she went to the hospital, was diagnosed with a concussion, and was given intravenous medications for the pain. That was the first of more than 500 visits S.T. made to healthcare providers to address a constellation of conditions related to her claim that she suffered a traumatic brain injury.

One year after the accident, the Social Security Administration declared S.T. permanently disabled and awarded her permanent disability benefits. Since the accident, S.T. has received ongoing speech and cognitive therapy at the Veterans Administration Hospital.

Beginning in November 2010, S.T. was treated by Dr. Paula Reid, a clinical psychologist. In November 2010, Dr. Reid performed a neuropsychological evaluation and found that S.T. had experienced a "significant reduction in the predicted intellectual performance on verbal comprehension and processing speed." Dr. Reid noted that S.T.'s "processing speed difficulties impaired her performance on many of the tasks which were

6

time dependent [and] specifically those related to complex" language material. S.T. also exhibited "a significant amount of depressive and anxious symptomology." Dr. Reid diagnosed S.T. as suffering from cognitive, anxiety, and depressive disorders. Dr. Reid opined that S.T.'s cognitive impairment is "expected to be a chronic and permanent condition."

Between June 2011 and August 2012, Dr. Peter Crain, a board-certified forensic psychiatrist, examined S.T. and reviewed her medical records.[1] He diagnosed S.T. as suffering from such conditions as post-concussion syndrome, major depressive disorder, post-traumatic migraine disorder, intracranial hypertension, and left trigeminal neuralgia.[2] Dr. Crain found those conditions to be "causally related to the accident and . . . permanent in nature."

A 2013 psychological report from the Veterans Administration Hospital indicated that S.T. scored varied results on cognitive, intelligence, and psychological assessment tests. On the one hand, the report indicated that S.T.'s "[m]easures of verbal comprehension . . . suggest[ed] a superior level of

---

[1] Dr. Crain was retained as an expert witness by S.T.'s counsel.

[2] Trigeminal neuralgia is a chronic pain disorder that affects the trigeminal nerve, which is located in the cranium. This disorder typically results in episodes of severe, sudden, shock-like pain in one side of the face that lasts for seconds to a few minutes. See Stedman's Medical Dictionary 1307 (28th ed. 2006); Bonica's Management of Pain 956, 1508 (Scott Fishman et al. eds., 4th ed. 2010).

receptive language functions" and that her "measures of nonverbal domains including memory, spatial processing and nonverbal abstract reasoning" were above average. On the other hand, her speed in processing complex information remained impaired. The report recommended -- as had Dr. Reid -- that S.T. receive extended time to complete projects, and that she be permitted "to record all verbally presented job related assignments" and be provided with "frequent breaks to reduce fatigue and headaches."

S.T. also took numerous medications on a daily basis which were prescribed to treat anxiety, depression, chronic headaches and migraines, facial pain, and symptoms resulting from her cognitive impairment.

B.

In February 2010, S.T. filed a civil complaint alleging that she suffered serious injuries resulting from the negligence of defendants 1515 Broad Street, LLC (1515 Broad Street); the Walsh Company, LLC (Walsh); County Glass & Metal Installers, Inc. (County Glass); and other fictitious defendants responsible for the building's construction, repair, or maintenance. On May 26, 2010, County Glass filed a third-party complaint against Virginia Glass Products Corp. (Virginia Glass) and Idesco Corp. (Idesco). In an amended complaint filed two years and six months after her injury, S.T. brought a negligence claim against Idesco and product-liability claims against Virginia

8

Glass.[3]  S.T. essentially contended that defendants played various roles in the negligent manufacture, installation, and maintenance of the doorway header that led to the accident and her injuries.

Idesco and Virginia Glass both moved for summary judgment arguing that S.T.'s claims were barred by the two-year statute of limitations.  The trial court denied Idesco's motion, finding that S.T. satisfied the fictitious-practice rule, R. 4:26-4, and therefore her claim was not barred by the two-year statute of limitations.  The court, however, dismissed all claims against Virginia Glass because S.T.'s amended complaint asserted new causes of action that did not relate back to the original complaint and therefore were beyond the statute of limitations.

The parties engaged in more than two years of discovery.  The disputed issues focused on the identity of the object that struck S.T.'s head, the parties responsible for S.T.'s injuries, and the nature and extent of any causal relationship between S.T.'s medical conditions and the accident.  The defense claimed that S.T.'s purported injuries were not caused by the accident at 1515

_____

[3]  1515 Broad Street owned the building where the injury occurred.  1515 Broad Street contracted with Walsh to perform building renovations.  Walsh then contracted with County Glass to furnish and install the door through which S.T. passed when the object fell and struck her head.  County Glass, in turn, purchased the door, along with its glazing and frames, from the door's manufacturer and distributor, Virginia Glass.  S.T.'s employer, ABB Lummis, retained Idesco to install the magnetic locking system on that door.

9

Broad Street.  The defense submitted a biomechanical analysis and engineering reports suggesting that the object that struck S.T.'s head was a light cladding surface layer -- not a metal plate, as claimed by S.T.  The defense also asserted that there was no objective evidence, such as a magnetic resonance imaging (MRI) or computerized tomography (CT) scan, to show that S.T. suffered an organic brain injury.

In July 2013, defendants filed an offer of judgment in the amount of $475,000 to settle the case.  See R. 4:58-1, -3.[4]  S.T. rejected the offer against the advice of her attorney.

In advance of the scheduled trial date, on September 10, 2013, S.T.'s attorney filed a motion with the Law Division pursuant to Rule 4:26-2(b) and RPC 1.14(b),[5] seeking the appointment of a guardian ad litem to represent S.T. for the limited purpose of determining whether to accept defendants' offer of

---

[4]  Under the offer of judgment rule, if S.T. received a money judgment of "80% of the offer or less," she would have to pay defendants the costs of suit, "all reasonable litigation expenses incurred following non-acceptance," and prejudgment interest.  R. 4:58-2 to -3.

[5]  Rule 4:26-2(b)(4) provides that "[t]he court may appoint a guardian ad litem for [an] . . . alleged mentally incapacitated person on its own motion."

RPC 1.14(b) authorizes a lawyer to seek the appointment of a guardian ad litem when he "reasonably believes that the client has diminished capacity, [and] is at risk of substantial" financial harm unless action is taken to protect the client's interest.

judgment.  In his attached certification, counsel averred that he "reasonably believe[d]" that S.T. exhibited a "diminished capacity" that put her at "risk of substantial financial harm as well as psychological/physical harm."  Counsel disclaimed that he was suggesting that S.T. was "incompetent" or in need of a full-time guardian to manage her affairs.  He asserted only that S.T. suffered from a "diminished capacity to understand the issues relating to her case."  He expressed his serious concern about S.T.'s "physical and emotional ability to participate in the prosecution of her case and . . . attend a lengthy trial" as well as her "capacity to make adequately considered decisions regarding her case."  Counsel appended to the motion reports from Dr. Crain, Dr. Reid, and the Veterans Administration Hospital.  Notably, "there is no evidence [S.T.'s] counsel copied her on the motion" for the appointment of a guardian ad litem.  See S.T., 455 N.J. Super. at 559-60 n.3.

After counsel applied for the appointment of a guardian ad litem, he arranged for Dr. Crain to examine S.T. for the purpose of determining whether S.T. exhibited a "diminished capacity" to understand the issues related to her case.  Dr. Crain expressed his opinion -- in a two-sentence report submitted to the court -- that S.T. "shows a diminished capacity to fully consider the risks of her decisionmaking in regard to how to proceed with the case."  S.T. later asserted that she was not advised of the purpose of the examination.

11

Before deciding the motion, the court conducted an in-camera conference. On September 27, 2013, the court found "good cause" for the appointment of attorney Frederick Miceli to serve as a guardian ad litem for S.T. and adjourned the November trial date. Nothing in the record indicates that S.T. was aware of the conference or of the implications of the appointment of a guardian ad litem.

C.

Miceli reviewed the "extensive case materials," including the discovery and medical records, and interviewed S.T. twice in person and once over the telephone. In a March 17, 2014 report submitted to the court, Miceli concluded that S.T. either did not have "the requisite understanding and ability . . . to make a rational decision regarding her case" or had an "intransigent unwillingness to confront the realities" if the case proceeded to trial. Miceli noted that when he explained to S.T. the risk of rejecting the offer of judgment, she simply responded that "she had nothing to lose because her life had been taken away from her." According to Miceli, S.T. could not accept that her New York treating physician, Dr. Reid, refused to testify at trial and that the court had barred the testimony of another expert.[6] Miceli finally

_____

[6] In a supplemental report from Miceli and letter from Dr. Reid's attorney, it became clear that Dr. Reid would not "voluntarily" testify at trial, as an expert or fact witness. That did not foreclose, however, the ability of S.T.'s counsel

12

expressed his opinion that, pursuant to <u>Rule</u> 4:26-2(b)(4), a guardian ad litem should be entrusted with the authority to decide for S.T. whether the case should be resolved by trial or settlement.

On April 22, 2014, without conducting a guardianship hearing, the court entered an order, pursuant to <u>Rule</u> 4:26-2(b)(4), empowering Miceli to make "all decisions regarding the ultimate disposition of this case, whether by trial or settlement in accordance with the powers of a Guardian Ad Litem as set forth in the Rules of Court."

On May 6, 2014, without S.T.'s consent, an agreement was reached among the parties to settle the lawsuit for the sum of $625,000. After deducting attorney's fees and costs, the guardian ad litem's fees, and the medical liens from that amount, S.T. would receive $254,322.65. In a June 17, 2014 supplemental letter to the court, Miceli expressed again his belief that S.T.'s judgment was impaired by diminished capacity. In his opinion, in light of "the issues regarding liability, causation, and the nature and extent of the damages," "the settlement [was] fair and reasonable and in [S.T.'s] best interests."

---

to depose Dr. Reid as a fact witness in New York and present her deposition testimony at trial. <u>See</u> <u>R.</u> 4:11-5; <u>R.</u> 4:16-1(c).

On July 1, 2014, the court conducted a "friendly hearing" to assess the reasonableness and fairness of the settlement and to determine whether to approve it. See R. 4:44-3 (stating that a court shall hear "[a]ll proceedings to enter a judgment to consummate a settlement in matters involving . . . mentally incapacitated persons").[7] At the hearing, S.T.'s attorney stated that "[w]e are not in any way saying that [S.T.] is incompetent to handle her affairs, but just [that she has] a limited diminished capacity with regard" to deciding whether to settle her case. Counsel estimated that if the case did not settle, a trial would run at least four weeks.

Miceli, the guardian ad litem, also addressed the court. Relying on Dr. Crain's report and his own investigation, Miceli expressed his absolute confidence that S.T. suffered from "diminished capacity" and that the guardian ad litem, with the advice of S.T.'s counsel, should render the decision whether to settle the case. Miceli appraised the risks of proving liability and damages, including the challenge of proving causation, given that none of S.T.'s MRIs or CT brain scans "showed an organic injury." Noting the potential that a jury could return an unfavorable verdict, Miceli viewed the settlement as "fair and

---

[7] "Friendly hearing" is a term of art used in our jurisprudence to describe the hearing at which the court reviews a proposed settlement for minors or mentally incapacitated persons pursuant to Rule 4:44-3.

reasonable" and "in [S.T.'s] best interests," and he "urge[d] the [c]ourt to approve the settlement."

Also present at the hearing were counsel for defendants, who sought approval of the settlement.

S.T. testified that she wanted to go to trial, noting that she had already advanced $30,000 to cover expenses. Although she expressed satisfaction with the representation provided by her attorney, she considered the settlement offer an inadequate recompense for her injuries. S.T. explained that she understood the risks of proceeding to trial -- but that she and her family had accepted risks in life when they made their perilous flight from Vietnam by boat. She stated that she did not want to accept "30 cents to a dollar" -- a settlement that did not cover the amount she owed to medical providers and to others who helped support her during her disability. She compared the "forced settlement" to a lifetime jail sentence, saying, "it's just not fair."

The court approved the settlement agreement. Under the agreement, S.T. was to be paid $625,000 -- $550,000 from defendants County Glass and Walsh and $75,000 from defendant Idesco. The $625,000 was allocated as follows: $254,322.65 in damages to S.T.; $190,998.75 in legal fees and unreimbursed expenses to S.T.'s counsel; $22,720.50 in fees to Miceli; and $156,958.10 in payment of medical and workers compensation liens.

15

The court explained its reasons for approving the settlement. The court observed that Miceli was a knowledgeable and experienced attorney and advised S.T. "to trust his judgment" because "it's in your best interests." The court discoursed on the unpredictability of juries -- a jury might return no monetary award or a lesser or greater award than the settlement. The court recognized that S.T. was "a very intelligent woman," stating, "anybody who listens to you talk . . . can hear you have . . . a very good grasp of your situation. You obviously know the medicine involved, and the medical terms." The court, however, added that "sometimes a little knowledge is dangerous. I'm not sure you know enough. Because the mere fact that you want to reject a $625,000 offer is troubling." Although the court acknowledged that S.T. would reject the settlement offer and "take [her] chances in front of a jury," it nevertheless believed that S.T. did not understand the complexities and difficulties of the case and was guided by her emotions. After the court made its ruling, S.T. responded, "you're making a wrong decision."

S.T. appealed from the trial court's appointment of the guardian ad litem and approval of the settlement. Idesco filed a protective cross-appeal, arguing that if the Appellate Division vacated the settlement, it should reverse the trial court's denial of its motion for summary judgment on statute-of-limitations grounds.

16

II.

The Appellate Division affirmed the trial court's appointment of the guardian ad litem, its authorization of the guardian ad litem to decide whether to settle the case, and its approval of the settlement over S.T.'s protest. S.T., 455 N.J. Super. at 548-49. The Appellate Division summarized two key legal principles that guided its decision. First, under Rule 4:26-2(b)(4), "a trial court may appoint a [guardian ad litem] if there is good cause to believe that a party lacks the mental capacity" to make decisions needed in the litigation. Id. at 548. The guardian ad litem's charge is to investigate the party's mental capacity and then "to provide the court with any information necessary to protect the person's best interests." Id. at 557-58. Second, if based on the information adduced from the guardian ad litem's investigation, the court finds by clear and convincing evidence that the party is mentally incapable of making important decisions, such as whether to try or settle the case, the court then may empower the guardian ad litem to make those decisions. Id. at 548, 558-59.

The Appellate Division determined that (1) there was "good cause" to appoint Miceli as a guardian ad litem based on the certification of S.T.'s counsel, id. at 561-62; (2) the guardian ad litem's "investigation provided clear and convincing evidence that [S.T.] was mentally incapable of deciding

17

whether to try or settle the case," id. at 562-64; (3) "the trial court properly found that [S.T.] lacked the mental capacity to decide whether to try or settle the case," id. at 548-49, 564; and (4) the court appropriately authorized the guardian ad litem to make that decision for S.T., id. at 564-66.  Last, the Appellate Division found "ample evidence to support the trial court's decision to approve the settlement" based on the appellate court's review of the record, including S.T.'s testimony at the friendly hearing.  Id. at 567.

Because Idesco asked the Appellate Division to render a decision on its protective cross-appeal only if the settlement was vacated, that issue became moot and was not addressed.  Id. at 569.

We granted S.T.'s petition for certification.  238 N.J. 437 (2019).

III.

A.

S.T. initially challenges the propriety of the trial court's appointment of the guardian ad litem for "good cause" under Rule 4:26-2.  S.T. primarily argues that she was deprived of her right to manage her affairs -- to decide for herself whether to settle or proceed to trial -- without the due process guarantees of a guardianship hearing under Rule 4:86 at which her mental capacity would have been determined.  S.T. contends that the trial court should not have conducted a friendly hearing to decide the reasonableness of the

18

settlement agreement advanced by the guardian ad litem without first determining at a Rule 4:86 hearing whether she was mentally incapacitated. She asserts that, in the absence of a finding of mental incapacity, the court should not have approved the settlement over her objections, and therefore the settlement should be vacated.

B.

Defendants 1515 Broad Street, County Glass, Walsh, and Idesco present similar arguments.[8] Defendants argue that the trial court properly invoked Rule 4:26-2 and found "good cause" for the "appointment of a guardian ad litem to investigate whether S.T. lacked the capacity to prosecute her claim." They also contend that under Rule 4:26-2, the court had the power to authorize the guardian ad litem "to make litigation-related decisions" without conducting a guardianship hearing to determine S.T.'s mental capacity pursuant to Rule 4:86. According to defendants, the role of a Rule 4:86 hearing is to assess whether a person is "generally incompetent to manage her person or property."

"Even if a hearing should have occurred," defendants posit that S.T. has not asserted that she can show that "vesting a guardian ad litem with litigation-related decision-making authority" was not justified by clear and convincing

---

[8] 1515 Broad Street and County Glass submitted identical briefs. Walsh expressly relies on the opposition brief filed by 1515 Broad Street. Idesco filed a separate brief.

19

evidence. Next, defendants submit that the trial court did not abuse its discretion in approving the settlement. In their view, the court saved S.T. from "a significant risk of financial ruin." They maintain that we should not presume that an independent counsel retained by or appointed for S.T. "would have advised her to reject the settlement." And last, defendants suggest that a remand for a competency hearing would likely be a futile effort because of "the mountain of evidence of [S.T.'s] incompetency for the purpose of making litigation-related decisions."

If this Court vacates the settlement, Idesco urges the Court to exercise its original jurisdiction and dismiss S.T.'s claim against it on statute-of-limitations grounds or, alternatively, to remand the issue to the Appellate Division.

## IV.

This appeal raises four distinct issues: (1) whether S.T.'s attorney fulfilled his professional responsibility under RPC 1.14(b) by requesting the appointment of a guardian ad litem based on his reasonable belief that S.T. suffered from a "diminished capacity" in making litigation decisions; (2) whether the court properly appointed a guardian ad litem under Rule 4:26-2 to investigate whether S.T. had the mental capacity to decide whether to settle her case or proceed to trial in light of the $475,000 offer of judgment;

20

(3) whether the court appropriately delegated to the guardian ad litem the authority to determine S.T.'s mental capacity to make key legal decisions and then appropriately gave the guardian ad litem the power to settle the case, without holding a guardianship hearing or rendering a judgment on S.T.'s mental capacity pursuant to Rule 4:86; and (4) whether the court erred in approving the settlement over S.T.'s vocal opposition.

The issues before us are generally legal in nature -- the construing of court rules, statutes, and constitutional precepts -- and therefore our standard of review is de novo. See Willingboro Mall, Ltd. v. 240/242 Franklin Ave., L.L.C., 215 N.J. 242, 253 (2013). We must judge for ourselves the meaning of the law that is in dispute, as well as the soundness of the legal reasoning and decisions of both the trial court and Appellate Division. See ibid.

We begin with some basic principles of law.

A.

N.J.S.A. 2A:15-1 guarantees that "[e]very person who has reached the age of majority . . . and has the mental capacity may prosecute or defend any action in any court." The Rules of Professional Conduct, moreover, require lawyers to "abide by a client's decisions concerning the scope and objectives of representation" and whether to accept or reject a settlement offer. RPC 1.2(a). Those provisions are just a few sources that reflect a "clear public

21

policy . . . to respect the right of self-determination of all people." See M.R., 135 N.J. at 166.

"[C]ompetent people ordinarily can choose what they want," even when their choices are unwise or contrary to their best interests. Id. at 167; see also Faretta v. California, 422 U.S. 806, 834 (1975) (finding that a person's decision to represent himself in a criminal case, even though ill-advised, "must be honored out of 'that respect for the individual which is the lifeblood of the law'" (quoting Illinois v. Allen, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring))). The right of individuals to determine their unique destiny through the decisions they make -- to govern and manage their own affairs -- is an implicit guarantee of the New Jersey Constitution, which provides that "[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." N.J. Const. art. I, ¶ 1; see M.R., 135 N.J. at 166.

A client's interest in her lawsuit -- and the monetary damages that may come from a favorable jury award or settlement -- unquestionably is a property right. Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982) ("[A] cause of action is a species of property protected by the Fourteenth Amendment's

Due Process Clause.").  No person can be deprived of her right to govern and manage her own affairs -- or her right to control the fate of her lawsuit -- based on mental incapacity without rigorous adherence to the procedural protections set forth in our rules of court, statutes, and case law.  See R. 4:86-1 to -8; N.J.S.A. 3B:12-24 to -35; In re S.W., 158 N.J. Super. 22, 24-26 (App. Div. 1978).

The trial court stripped S.T. of her right to control her lawsuit on her own terms and empowered the guardian ad litem to settle the case -- with the court's ultimate approval -- against her express wishes.  We conclude that the court did not follow the requisite procedures in denying S.T. the right to accept or reject a settlement offer.  Specifically, the court improperly vested the guardian ad litem with the singular authority to settle the case without holding a hearing to determine whether S.T. suffered from a mental incapacity that rendered her unable to make that legal decision for herself.  See R. 4:86-1 to -8; N.J.S.A. 3B:12-24 to -35.

B.

1.

Generally, "[i]n accepting a case, the lawyer agrees to pursue the goals of the client to the extent the law permits, even when the lawyer believes that the client's desires are unwise or ill-considered."  Ziegelheim v. Apollo, 128

23

N.J. 250, 261 (1992); see also RPC 1.2. RPC 1.14(b) represents an exception

to that rule. That rule provides:

> When the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator, or guardian.
>
> [RPC 1.14(b).]

We do not question that S.T.'s attorney acted in good faith when,

pursuant to RPC 1.14(b), he requested the appointment of a guardian ad litem

based on his reasonable belief that S.T. suffered from a "diminished capacity"

to make the critical legal decision whether to settle the case. The attorney

reasonably believed, based on his understanding of S.T.'s medical records and

his conversations with his client, that her cognitive and mental impairments

affected her ability to view objectively the strengths and weaknesses of her

case. He feared that her refusal to accede to his advice and settle the case

might lead to financial ruin. Guided by RPC 1.14(b), he took "reasonably

necessary protective action . . . [by] seeking the appointment of a guardian ad

litem" under Rule 4:26-2(b).

24

S.T.'s counsel, however, erred in not copying his client on the motion for the appointment of a guardian ad litem. S.T. had the right to know about such a consequential motion filed by her lawyer. We agree with the Appellate Division that when "counsel for an alleged mentally incapacitated person makes a motion to appoint a [guardian ad litem]," the motion must be served on that person. See S.T., 455 N.J. Super. at 560 n.3.

## 2.

We also find that the trial court, after reviewing S.T.'s counsel's certification along with the attached expert medical reports, properly exercised its discretion in appointing a guardian ad litem. The court's order, however, should have cited the basis of the court's authority, Rule 4:26-2, and made clear the role to be played by the guardian ad litem. The court's instructions should have directed the guardian ad litem to conduct an investigation to determine S.T.'s mental capacity and then to make a recommendation to the court whether her best interests required the filing of an action for a limited or general guardianship of S.T. in accordance with Rule 4:86.

The interplay between Rule 4:26-2 and Rule 4:86 is critical to an understanding of how this case should have proceeded.

Rule 4:26-2(a) provides that a "mentally incapacitated person shall be represented in an action by the guardian of either the person or the property."

When a "mentally incapacitated person" is not represented by a guardian, paragraph (a) authorizes the court to appoint "a guardian ad litem . . . in accordance with paragraph (b) of this rule." Ibid. A judicial determination of mental incapacity, however, must precede the appointment of a guardian. See R. 4:86-1 to -8; N.J.S.A. 3B:12-24 to -35. Paragraph (b) of Rule 4:26-2 sets forth the initial procedure that follows when a person is alleged to be mentally incapacitated.

Rule 4:26-2(b) provides that "[t]he court may appoint a guardian ad litem for . . . [an] alleged mentally incapacitated person on its own motion," R. 4:26-2(b)(4) (emphasis added), or the motion of others, R. 4:26-2(b)(2) and (3). The word "alleged" before "mentally incapacitated" is not surplus language but is central to understanding the guardian ad litem's function at this stage.[9]

---

[9] Rule 4:26-2, in relevant part, states:

> (a) Representation by Guardian. Except as otherwise provided by law or Rule 4:26-3 (virtual representation), a minor or mentally incapacitated person shall be represented in an action by the guardian of either the person or the property, appointed in this State, or if no such guardian has been appointed or a conflict of interest exists between guardian and ward or for other good cause, by a guardian ad litem appointed by the court in accordance with paragraph (b) of this rule.

> (b) Appointment of Guardian Ad Litem.

26

Under <u>Rule</u> 4:26-2(a), a guardian for a "mentally incapacitated person" is authorized to prosecute a legal action on her behalf. In contrast, the role of a guardian ad litem for an "alleged mentally incapacitated person" under <u>Rule</u> 4:26-2(b) is more limited, as made clear by commentary to the court rule:

> The use of the qualifier "alleged" to the use of the term "mentally incapacitated person" in subparagraphs (b)(2), (b)(3) and (b)(4) is to make clear that in contradistinction to the appointment of a guardian (<u>see</u> <u>R.</u> 4:86), which requires an adjudication of mental incapacitation, a guardian ad litem's appointment is dependent only upon the allegation of mental incapacitation. <u>The guardian ad litem's responsibility is to advise the court as to whether a formal competency hearing may be necessary and if so, to represent the alleged mentally incapacitated person at that hearing</u>.
>
> [Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 3 on <u>R.</u> 4:26-2 (2020) (emphasis added).]

. . . .

> (4) Appointment on Court's Motion. The court may appoint a guardian ad litem for a minor or alleged mentally incapacitated person on its own motion.

We acknowledge that this rule is not a model of clarity. The interpretive mistakes made by both the trial court and Appellate Division might have been avoided if the language of the rule was more precise. We request that the Supreme Court Civil Practice Committee review <u>Rule</u> 4:26-2 in light of this opinion.

27

Thus, when a guardian ad litem is appointed pursuant to Rule 4:26-2(b) to represent an individual who is "alleged" to be mentally incapacitated, the guardian ad litem's function is to inquire into the individual's alleged mental incapacity. The role of a guardian ad litem is to act as an independent investigator and inform the court on the subject of the client's mental capacity. See M.R., 135 N.J. at 173-74 (quoting Pressler & Verniero, official cmt. on R. 5:8A and R. 5:8B). In that sense, the guardian ad litem serves "as 'the eyes of the court' to further the [client's] 'best interests.'" In re Mason, 305 N.J. Super. 120, 127 (Ch. Div. 1997). After completing its inquiry, the guardian ad litem submits a report to the court containing the results of the investigation and recommends whether a formal hearing should proceed under Rule 4:86. See M.R., 135 N.J. at 173; Pressler & Verniero, cmt. 3 on R. 4:26-2. The guardian ad litem's recommendations are not binding on the court; ultimately the court must make its own independent factfindings. See Milne v. Goldenberg, 428 N.J. Super. 184, 202 (App. Div. 2012). The court should not "cede [its] responsibility and authority" as the decisionmaker to the guardian ad litem. See ibid. (quoting P.T. v. M.S., 325 N.J. Super. 193, 216 (App. Div. 1999)).

Nothing in our court rules, statutes, or case law suggests that a guardian ad litem appointed to investigate a client's alleged mental incapacity has the

28

power to make legal decisions for the client before a judicial determination on her mental capacity. For example, in In re S.W., a hospital wanted to move its patient, S.W., to a nursing home. 158 N.J. Super. at 24. S.W., however, resisted the move and refused to sign Medicaid forms necessary for the disbursement of money to the nursing home and for her placement there. Ibid. Without making any claim that S.W. was mentally incompetent, the hospital sought the appointment of a guardian ad litem who would have authority to sign the required documents on S.W.'s behalf. Ibid. Despite any adjudication or proof of S.W.'s incompetency, the court "determined, without elaboration, that [S.W.'s] 'interests' required her to have [a guardian ad litem], and an order was entered naming" a guardian ad litem to sign the Medicaid papers. Id. at 24-25.[10]

The Appellate Division reversed, holding that the "judicial designation of a person to sign documents on behalf of an adult deprives the latter . . . of the management and control of his personal affairs" and "cannot be done without the institution of an action in accordance with Rule 4:83 [(the predecessor to Rule 4:86)]." Id. at 26. The purpose of such an action is to

---

[10] Our jurisprudence, at times, uses the terms guardian and guardian ad litem interchangeably. That dual usage of those terms does not alter the procedural requirements that must be observed before a person can be deprived of her right to manage her affairs on the ground of incapacity.

29

allow a court to adjudicate at a hearing whether, based on medical proof, "the alleged incompetent is unfit and unable to govern himself or herself and to manage his or her affairs" and therefore in need of the appointment of a guardian of the person or property. Ibid. The Appellate Division emphasized that any restraint that would deprive "an allegedly incompetent person of his liberty or . . . of the control of his property and the management of his personal affairs" must be imposed "in a constitutional manner in a proceeding instituted for that purpose." Ibid. (quoting Borough of East Paterson v. Karkus, 136 N.J. Eq. 286, 288 (Ch. 1945)). The Appellate Division found in S.W. that the trial court did not proceed in the constitutional manner prescribed by Rule 4:83. Id. at 26.

In this case, the guardian ad litem appointed by the court -- Miceli -- conducted an investigation into S.T.'s mental capacity, reviewed the medical reports and counsel's certification, interviewed S.T. on several occasions, evaluated the strengths and weaknesses of the causes of actions against defendants and the value of S.T.'s potential damages, and reported to the court. The guardian ad litem recommended to the court that he be given the authority to decide whether S.T.'s case should be resolved by trial or settlement. Without affording S.T. notice or a hearing and without making a judicial determination that S.T. was a mentally incapacitated person, the court ceded to

30

Miceli the power to make "all decisions regarding the ultimate disposition of this case, whether by trial or settlement." By abdicating the Judiciary's nondelegable oversight and factfinding function, the trial court did not proceed in the constitutional manner prescribed by both Rule 4:86-1 to -8 and N.J.S.A. 3B:12-24 to -35 for the appointment of a guardian of an alleged mentally incapacitated person.

3.

An action for guardianship of an alleged incapacitated individual and the proceedings required for a judgment of incapacity are governed by court rule and statute. R. 4:86-1 to -8; N.J.S.A. 3B:12-24 to -35. Rigorous procedural safeguards protect the subject of a guardianship hearing because a finding of incapacity results in an individual's loss of the right of self-determination.

An "[i]ncapacitated individual" is a person "who is impaired by reason of mental illness or intellectual disability to the extent that the individual lacks sufficient capacity to govern himself and manage his affairs." N.J.S.A. 3B:1-2. An action for the appointment of a guardian must comply with Rule 4:86-2. A guardianship complaint, among other things, must include two affidavits from properly qualified medical professionals, stating their opinions about "the extent to which the alleged incapacitated person is unfit and unable to govern himself or herself and to manage his or her affairs," R. 4:86-2(b)(2)(F), and

31

"the extent to which the alleged incapacitated person retains sufficient capacity to retain the right to manage specific areas, such as . . . legal . . . decisions," R. 4:86-2(b)(2)(G).

"If the court is satisfied with the sufficiency of the complaint and supporting affidavits and that further proceedings" are necessary, the court must (1) set a date for the hearing, R. 4:86-4(a)(1); (2) give the alleged incapacitated person "at least 20 days' notice" of the hearing, R. 4:86-4(a)(2); and (3) advise the person that if she opposes the action, "she may appear either in person or by attorney, and may demand a trial by jury," R. 4:86-4(a)(5). "[T]he trial of the issue of incapacity may be had without a jury . . . unless a trial by jury is demanded by the alleged incapacitated person or someone on his behalf." N.J.S.A. 3B:12-24. "[I]f the alleged incapacitated person is not represented by counsel," the court must appoint counsel. R. 4:86-4(a)(7).

Unless the alleged incapacitated person requests a jury trial, the court must take "testimony in open court" and "determine the issue of incapacity." R. 4:86-6(a). A finding of incapacity must be made by clear and convincing evidence. See M.R., 135 N.J. at 169, 171 ("[T]he burden of proving specific incapacity [is] by clear and convincing evidence.").

Upon making a finding of incapacity, the court may appoint a general guardian or a limited guardian, depending on whether the individual "lacks the

32

capacity to do some, but not all, of the tasks necessary to care for himself."

N.J.S.A. 3B:12-24.1(a) to (b). "A judgment of limited guardianship may

specify the limitations upon the authority of the guardian or alternatively the

areas of decision making retained by the person." N.J.S.A. 3B:12-24.1(b).

After determining whether a general or limited guardian is appropriate, the

court must then appoint an individual to serve as the guardian. R. 4:86-6(c).

None of the procedural steps required by our court rules or statutes were

followed in this case: a guardianship complaint with notice to S.T.,

accompanied by the affidavits of qualified medical professionals, was never

filed; a hearing with the taking of testimony, with S.T. represented by

independent counsel, was never conducted; factfindings by the trial court

based on clear and convincing evidence were never made; and S.T. was never

adjudicated by the court as a mentally incapacitated person. The trial court

ceded its judicial function, outsourcing to the guardian ad litem the role of

final arbiter of S.T.'s capacity.

The issue is not whether there was clear and convincing evidence of

S.T.'s incapacity in the record, as the Appellate Division found. See S.T., 455

N.J. Super. at 560, 563-64. The issue is that the trial court failed to conduct

the hearing -- either a jury or bench trial -- with the due process safeguards

required by our court rules and statutes.

33

4.

Rule 4:44-3 provides that "[a]ll proceedings to enter a judgment to consummate a settlement in matters involving . . . mentally incapacitated persons shall be heard by the court without a jury" and that "[t]he court shall determine whether the settlement is fair and reasonable." But there was no judicial finding that S.T. was mentally incapacitated in accordance with our court rules and statutes. Without such a finding, the trial court had no authority to conduct a friendly hearing under Rule 4:44-3 or to deny S.T. the right to determine for herself whether to accept a settlement in her case. We therefore conclude that the trial court erred in conducting a friendly hearing and then approving the settlement against S.T.'s express will.

In the view of counsel, the guardian ad litem, and the trial court, a rejection of the settlement would have been an act of foolishness and against S.T.'s own best interests. But without a judicial finding of incapacity, in accordance with our court rules and statutes, S.T. had the right to make that choice and reject the settlement. Ultimately, she will live with the consequences of her freely made decision.

We offer this observation. S.T.'s attorney recommended that a guardian ad litem be appointed for her when she rejected a $475,000 offer of judgment. According to S.T.'s attorney, S.T.'s rejection of the original offer was some

34

evidence of her purported incapacity. Several months later, however, after the appointment of a guardian ad litem, defendants agreed to a $625,000 settlement. Had S.T. not rejected the original offer, an additional $150,000 would not have been placed on the table.

A settlement is a compromise between the parties, a form of insurance in which the parties protect themselves against verdicts at polar ends of the spectrum. In many cases, there will be a wide range of reasonable outcomes, and "reasonable people may differ on what is fair compensation in any particular case." See Cuevas v. Wentworth Grp., 226 N.J. 480, 500 (2016) (quoting Johnson v. Scaccetti, 192 N.J. 256, 280 (2007)). Presumably, defendants agreed to the settlement in furtherance of their own self-interests, not out of benevolence.

We do not pass on the merits of S.T.'s case -- its strengths, weaknesses, or potential value. Nor do we offer any opinion on the wisdom of the choices S.T. wishes to make. We conclude only that the judicial system did not function in the constitutional manner prescribed by our court rules and statutes in ceding to the guardian ad litem the authority to determine S.T.'s capacity and to settle her case.

Accordingly, we reverse the judgment of the Appellate Division and vacate the settlement.

35

## V.

Finally, Idesco has urged this Court, in the event we vacate the settlement, to exercise our original jurisdiction and consider its cross-appeal brought before the Appellate Division in which it challenged the trial court's denial of its motion for summary judgment. The issue raised is whether the complaint filed against Idesco is barred by the statute of limitations. Idesco did not cross-petition for review of that issue, and that issue has not been briefed or argued by both parties. We decline to pass judgment on it.

In light of our decision to vacate the settlement, Idesco's issue is interlocutory in nature. The Appellate Division denied Idesco's earlier motion for leave to appeal. We therefore will not remand this singular issue to the Appellate Division and delay a disposition of the entirety of the proceedings before the trial court.

## VI.

For the reasons explained, we reverse the judgment of the Appellate Division, vacate the settlement approved by the trial court, and remand for proceedings consistent with this opinion. The path forward is left to the parties, their counsel, and the court. We only caution that if a guardianship action is pursued, it must be in accordance with our court rules and statutes.

36

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, FERNANDEZ-VINA, and SOLOMON join in JUSTICE ALBIN's opinion.  JUSTICES PATTERSON and TIMPONE did not participate.